AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
12/5/25
CENTRAL DISTRICT OF CALIFORNIA
BY: ___MRV___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
12/05/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___jm___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

United States of America

v.

Dalila Gonzalez,

Defendant

Case No.  2:25-mj-07611-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 4, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)(II) | Possession with Intent to Distribute Cocaine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Rockne Harmon
Complainant's signature

Rockne Harmon, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 12/5/2025 at 2:23 pm

Judge's signature

City and state: Los Angeles, California

Hon. Michael Kaufman, U.S. Magistrate Judge
Printed name and title

AUSA: Rahul R.A. Hari (x6159)

**AFFIDAVIT**

I, Rockne Harmon, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against, and arrest warrant for, Dalila GONZALEZ ("GONZALEZ") for a violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii)(II) (Possession with Intent to Distribute Cocaine).

2. This affidavit is also made in support of an application for a search warrant to search the following digital devices (the "SUBJECT DEVICES"), seized during the arrest of GONZALEZ on December 4, 2025, and held in the custody of Homeland Security Investigations ("HSI"), in El Segundo, California, as described more fully in **Attachment A**:

    a. Pink iPhone with brown case discovered on GONZALEZ's person during inspection;

    b. Purple iPad Mini, Model A2568, SN: NJQ6RDJN7C with purple case discovered in GONZALEZ's backpack during inspection; and

    c. Pink Apple Watch SE, 40 mm, found on GONZALEZ's wrist during inspection.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)(II) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and

Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in **Attachment B**. **Attachments A** and **B** are incorporated herein by reference. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and databases. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4. I am a Special Agent with Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") where I have been employed since March 9, 2025. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

5. During my tenure as a Special Agent, I have completed approximately six months of instruction at the Federal Law Enforcement Training Center ("FLETC"), in Glynco, Georgia, completing the Criminal Investigator Training Program and HSI's add-on training: Homeland Security Investigations Special Agent Training. During my time at FLETC, I completed blocks of

lectures, labs, and exams that trained me in investigating and identifying crimes, specifically drug trafficking, customs laws, and gangs.

6. I hold a Bachelor of Science degree in Business Management from California State University, Northridge, earned in August 2013, and a Master of Arts degree in Homeland Security from Northeastern University, earned in May 2018.

### III. SUMMARY OF PROBABLE CAUSE

7. On December 4, 2025, Dalila GONZALEZ attempted to travel from Los Angeles International Airport ("LAX") to Narita International Airport, Tokyo, Japan, on Japan Airlines ("JL") Flight 61.

8. LAX Customs and Border Protection ("CBP") officers conducted an inspection of GONZALEZ's checked luggage. During inspection, officers identified a water bottle with a white powdery substance that later field-tested positive for cocaine and weighed a total of approximately 1.14 kilograms. Officers also identified a headphone case containing a black, plastic-sealed, brick-shaped item containing a white powdery substance that later field-tested positive for cocaine, weighing a total of approximately .48 kilograms.

### IV. STATEMENT OF PROBABLE CAUSE

9. Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following:

10.  On December 4, 2025, GONZALEZ attempted to depart from LAX to Narita, Japan on JL 61.  GONZALEZ had flown to Los Angeles, California from Las Vegas, Nevada on a domestic flight and was connecting to an international flight from LAX's Tom Bradley International Terminal. GONZALEZ was selected for inspection by CBP officers for having a travel pattern that matched previous contraband seizures.  Officers consulted law enforcement databases to identify GONZALEZ's travel patterns.

11.  At approximately 11:50 a.m., GONZALEZ checked in a black rolling suitcase (Tag No. AA401223) which GONZALEZ had previously checked in prior to her domestic flight from Las Vegas, Nevada.  Japan Airlines employees pulled the bag for CBP inspection.  GONZALEZ's bag contained clothing, personal effects, and an insulated water bottle with approximately 40 ounces of volume.  Officers opened the bottle and found crumpled napkins concealing a white powdery substance.



12. Officers also examined a black hard case that appeared to be a headphone case. Inside, officers found a brick-shaped object wrapped in electrical tape.



13. At approximately 12:00 p.m., GONZALEZ boarded JL 61 at Gate 154. Officers entered the airplane and escorted GONZALEZ off the flight to a secondary baggage inspection site.

14. Officers showed GONZALEZ the checked bag, which she identified verbally as her own and by showing that she had a matching bag tag.

15. GONZALEZ told officers that she was traveling to Japan for a one-week vacation. GONZALEZ told officers that she had packed her own luggage and knew what was inside of the bag. When officers asked what her what was inside the water bottle, GONZALEZ said it was creatine. I understand creatine to be an

over-the-counter supplement often used by athletes or weightlifters. Officers asked GONZALEZ about the black headphone case and what was inside the brick-shaped package. GONZALEZ told officers that she wrapped various items and taped together to prevent the case from denting or collapsing. When officers asked GONZALEZ what she had packed inside the brick-shaped-object, GONZALEZ responded that she could not recall exactly what was inside. GONZALEZ eventually withdrew her agreement to be interviewed, and the interview was terminated.

16. CBP officers ran controlled-substance field tests on a total of six items from GONZALEZ's bag: (1) the contents of the brick shaped object, (2) the substance inside the water bottle, and (3-6) the contents of four body-wash bottles.

17. CBP officer Jose Carbajal opened the brick-like item inside of the headphone case, revealing a white powdery substance that he tested using the NIK Test G. The test resulted in positive results for cocaine. Officer Carbajal tested the white powdery substance inside the insulated water bottle was tested using a Gemini Chemical Identification Analyzer, which and yielded positive results for cocaine. The shampoo bottles were tested using NIK Kit Y for Cannabidiol ("CBD") oil/ Tetrahydrocannabinol ("THC") and yielded positive results for CBD oil/THC. CBP officer Wilfredo Quinonez witnessed the test.

18. At approximately 12:45 p.m., Supervisory CBP officer William Gernade approved a personal search of GONZALEZ following the discovery of the white powdery substance.

19. At approximately 1:00 p.m., HSI Special Agent Phu Vuong and I arrived at the secondary baggage inspection location to conduct an interview with GONZALEZ. We read GONZALEZ her <u>Miranda</u> rights and showed her a written copy. GONZALEZ verbally agreed to be interviewed and signed the copy of her written rights.

20. GONZALEZ told agents that "somebody" had given her the green water bottle and black tape wrapped, brick-shaped object and that she had packed them in her baggage. GONZALEZ stated that she communicates with the person through chatting and third-party applications. GONZALEZ stated that the person who had given her the bottle and wrapped object had told her not to open either and that they would later provide her with instructions on what to do with the objects. GONZALEZ admitted that she knew what was inside of the green water bottle. GONZALEZ requested an attorney shortly thereafter and the interview was terminated.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

21. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

22. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher- level suppliers, as well as associates, to process, package, and deliver the drugs and launder the drug proceeds.

23. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in

connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

24. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. These records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

25. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

26. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

27. Drug traffickers often maintain large amounts of United States currency to maintain and finance their ongoing drug trafficking businesses or as payment for their roles in ongoing drug trafficking, which operates on a cash basis. Traffickers will often take pictures on their digital devices of this cash to send to co-conspirators as proof of their ability to pay or to boast about sales.

### V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

28. As used herein, the term "digital device" includes the SUBJECT DEVICES.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   30.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## CONCLUSION

32. For all the reasons described above, I respectfully submit that there is probable cause to believe that GONZALEZ has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)(II) (Possession with Intent to Distribute Cocaine)

33. There is also probable cause to believe that the items to be seized, described more fully **Attachment B**, will be found in a search of the SUBJECT DEVICES, described more fully in **Attachment A**.

                                                                                          /s/
                                          Rockne Harmon, Special Agent, HSI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 5th day of December 2025.

_____
HON. MICHAEL KAUFMAN
UNITED STATES MAGISTRATE JUDGE